Docket No. 90537–Agenda 29–May 2001.

THE PEOPLE 
ex rel.
 ROBERT J. KLAEREN II 
et al
.,

 Appellees, v. VILLAGE OF LISLE 
et al.
, Appellants.

Opinion filed October 18, 2002.

JUSTICE KILBRIDE delivered the opinion of the court:

The primary issue presented by this appeal is whether a landowner whose property abuts a parcel subject to a proposed annexation, special use, and rezoning petition can be wholly denied the right to cross-examine witnesses at a public hearing regarding the petition. Plaintiffs, residents of the Village of Lisle (village) who reside next to a parcel where defendant Meijer, Inc. (Meijer), plans to build a retail store, sought a preliminary injunction to prevent the continuation of site preparation for construction of the store, alleging that procedural defects occurred in the public hearing for the annexation and rezoning of the property. The circuit court of Du Page County granted the preliminary injunction. Defendants, Meijer, the village, and Saint Procopious Abbey (the Abbey), brought an interlocutory appeal under Supreme Court Rule 307(a) (188 Ill. 2d R. 307(a)). The appellate court held that the complete denial of the right of interested parties to cross-examine witnesses at the village’s joint public hearing was improper. 316 Ill. App. 3d 770. We agree and hold that, because the joint hearing included a special use petition, due process required that interested parties be afforded the right to cross-examine witnesses.

I. BACKGROUND

The following facts were adduced at the preliminary injunction hearing.

Meijer sought to open a new store in the village, entering into a contract with the Abbey to purchase a 60-acre parcel of land. As part of the development plan for the store, Meijer requested that the village pass ordinances: (1) annexing the parcel; (2) rezoning the parcel from R-1 (residential) to B-2 (commercial business district); and (3) granting special uses for a planned unit development and for a gasoline service station. Throughout the municipal zoning process, Meijer was opposed by plaintiffs, who alleged that the increased traffic, noise and lighting around the new store would diminish their property values and quality of life. Plaintiffs’ challenge to the annexation, rezoning and special use focuses on alleged procedural irregularities that occurred at a joint public hearing that took place on July 9, 1998. On that date, the village board of trustees (village board), the village plan commission (plan commission), and the village zoning board of appeals (zoning board) each convened a separate public hearing regarding the Meijer proposal at the village hall. Each body then independently moved to recess its hearing and reconvene in a joint hearing at a local junior high school auditorium.
(footnote: 1) The record reveals that the joint hearing attracted a large audience. The auditorium seats 500 people. On the night of the hearing, audience members were standing in the aisles and in the hall outside, as well as sitting on the stairs leading up to the stage and on the stage itself.

When the hearing reconvened, the village mayor, Ronald Ghilardi, who presided over the proceeding, stated:

“This is a public hearing. It is not a debate. There will be no attempt at tonight’s hearing to answer any question raised by the audience.

* * *

To the extent possible the speaker will address questions and concerned [
sic
] raised by the combined boards this evening.

* * *

The petitioner will be first subject to any questions by the assembled boards. We will attempt to deal with each individual aspect of the presentation as it’s made.

People in the audience speaking in favor of the proposal will then be heard. People in the audience speaking in opposition of the proposal will then be heard. The petitioner will then be allowed to make closing comments.

After closing comments by the petitioner, the public hearing will be adjourned.

Public records will remain open for written comments by interested parties. Any written comments must be received at the Village offices by 4:30 p.m. Friday, July 31st.

* * *

To be fair to everyone in the audience, I ask that you limit your comments to two minutes each. I will be the time keeper and will let you know when 15 seconds remain.

* * *

No one will be allowed to speak a second time until everyone has an opportunity to speak once. That requirement will also be applicable to members of the assembled boards.”

Witnesses then spoke on behalf of Meijer. Those witnesses included an architect, a land planner, a traffic consultant, and a hydraulic engineer. During the presentations of each of these witnesses, several members of the village board, the plan commission, and the zoning board asked questions.

Following Meijer’s witnesses, the mayor invited those audience members in favor of the project to speak. Two audience members spoke in favor of the development and over 40 individuals spoke in opposition to the proposed project. In response to a question from an opponent of the project, Mayor Ghilardi relayed that only a single representative would be allowed to speak on behalf of any group or organization and that the two-minute time limit would be enforced. Mayor Ghilardi further explained:

“Rather than try and debate with you the procedure we are going to try and follow, I tried to explain at the beginning of the meeting. My instructions would give everyone who wants to speak or had a written comment an opportunity to be heard. I think that is fair.

No matter what we do it is going to be characterized as being unfair. That being the case, we are going to proceed with the suggestion I made.”

Various opponents raised individual concerns related to the project. Among these concerns, opponents questioned: (1) whether the proposed development would have a greater impact on traffic than the Meijer representatives predicted; (2) whether the development was inappropriate for the neighborhood and would decrease the quality of life; and (3) whether parking lot traffic, snow removal operations, and garbage compactors would create unpredicted noise pollution in the area.

A real estate appraiser also testified on behalf of the opponents. He stated that he was familiar with Meijer stores and had conducted economic-impact analyses on similar, unrelated projects. While the appraiser stated that he had not inspected the neighborhood itself, he opined that homes in the blocks surrounding the development would be adversely impacted not less than 15% and those homes within a one-mile radius would be adversely impacted 5% to 7%.

 Many speakers made only general comments, but several identified questions they wanted the assembled bodies to present to the Meijer representatives. On several occasions, Mayor Ghilardi warned individuals that their time had expired or was about to expire.

Following the joint public hearing, plaintiffs filed a complaint, seeking, among other relief, an injunction to prevent a vote approving the annexation, rezoning, and special use. The trial court denied the injunction, reasoning that plaintiffs had failed to join all necessary parties. The village board subsequently adopted ordinances and approved resolutions annexing, rezoning, and granting a special use for the parcel. Plaintiffs then amended their complaint to add Meijer and the Abbey as defendants and added a claim sounding in 
quo warranto
. At plaintiffs’ request, the trial court entered a temporary restraining order, halting site preparation, and held a hearing on plaintiffs’ motion for a preliminary injunction.

During the hearing, plaintiff Robert Klaeren testified that he owned a home abutting the proposed development. Klaeren testified that he was concerned about the increased noise, light pollution, and storm water runoff that would be generated by the Meijer development. He also stated that his property value would decrease because of the development and that he feared village services such as snow removal and police protection would diminish in the remaining portions of the village because the village would be required to provide these services to a larger area as a result of the annexation.

According to Klaeren, he met with other village citizens prior to the joint public hearing and prepared a presentation. Klaeren stated that Mayor Ghilardi interrupted him before he could finish his presentation and that he would have asked questions of Meijer’s witnesses had he been allowed to do so by Mayor Ghilardi.

Plaintiff Carle Wunderlich similarly testified concerning diminished property values and increased noise and traffic. Wunderlich further testified that he had prepared an exhibit of photographs of a Meijer store that he was prevented from bringing into the joint public hearing. According to Wunderlich, he built his home across the street from the proposed Meijer development after his investigation of the parcel’s zoning lead him to believe that the Abbey would use the parcel for institutional purposes.

Ann Duker, a village trustee and former chair of the plan commission, testified on behalf of the plaintiffs. According to Duker, she was unaware of an ordinance authorizing joint hearings for the village board, the zoning board, and the plan commission, but that such hearings were held as a matter of custom and convenience. Duker testified that the plan commission made recommendations to the village board regarding subdivision plans and planned unit developments. Regarding the Meijer development, the plan commission had voted five to one to deny the recommendations and had adopted negative findings of fact. On cross-examination, Duker revealed that she had been elected to the position of village trustee, campaigning as an opponent of the Meijer development.

Steven Stroh, the chair of the zoning board, likewise testified that the zoning board had voted to deny Meijer a special use permit to operate a gas station on the development.

Thomas Ewers, the village director of community development and the village building and zoning commissioner, testified on behalf of plaintiffs. Ewers detailed the procedures used to process the Meijer application, the proposal presented to the village, the modifications of the proposal, and the ultimate approval of a modified agreement for annexation and rezoning.

Plaintiffs also introduced the testimony of Paul Davis, a real estate appraiser, via a videotaped deposition. Davis testified that he reviewed the proposed Meijer development to determine whether it would affect the value of surrounding properties. Davis further testified that he researched the sales of homes in several subdivisions adjacent to commercial developments. According to Davis, houses on the interior of such subdivisions sold for higher average prices than those that abutted the commercial development. Accordingly, Davis opined that the Meijer development would have a negative impact on the value of properties in the surrounding area. On cross-examination, Davis admitted that he had not prepared a written report and that he could not quantify the diminution in value.

Thomas McCabe, an engineer, testified on behalf of the Abbey. McCabe concluded that the site-preparation work that was being performed by Meijer would not have an adverse effect on the adjoining property owners. He recommended that the Abbey allow site-preparation work during the pendency of the transaction.

Jacques Gourguechon, a city planning consultant, testified for the village and Meijer. He described the land uses surrounding the Meijer development. Gourguechon also described the site plan for the proposed development, the open space required for storm water collection and wetlands mitigation, and the use of landscaping as buffering for the adjoining parcels. Gourguechon further produced an artist’s rendering of the completed development and testified that it adequately depicted how the development would appear when viewed from the residential area behind the store. According to Gourguechon, the development would have an impact on the neighboring parcels but the impact would be the same no matter how the Meijer parcel was developed.

Mark Norton, Meijer’s manager for new store construction, testified that soil had to be removed from the site and be replaced with suitable fill as part of the construction process. Before the temporary restraining order was entered by the trial court, such fill was available from an unrelated excavation on another Abbey parcel. According to Norton, alternative fill would cost approximately $40,000. In addition, Meijer had been required to furnish the village with letters of credit at a monthly cost of $1,900. Norton concluded that Meijer would be forced to spend an additional $1.5 to $2.5 million due to the additional expenses generated by the delay in site preparation in order to complete construction of the new store by the originally contemplated date.

Mayor Ghilardi testified that the purpose of the public hearing in the zoning and development context was to provide an opportunity for input on a legislative process that results in a policy decision. Mayor Ghilardi testified that he believed the joint public hearing procedure used by the village was practical and efficient. Regarding cross-examination, Mayor Ghilardi stated that the hearing was not designed to be “a debate between the petitioner and the proponents or opponents of the development.” He further stated:

“[S]o what we wanted to do is *** if you have a comment that you would like to make, please make your comment. If there are questions that you as one of the members of the public have, raise the question, and some time during the course of what is oftentimes a very lengthy process, those questions are addressed throughout the process.

Part of those questions are addressed also not only by the board members in their representative capacity, but also by the various consultants that the Village retains to review the materials submitted by the *** petitioner.”

When asked whether anyone in the public requested the right to cross-examine witnesses at the joint public hearing, Mayor Ghilardi responded:

“I don’t remember the use of the word cross-examine ***. People asked their questions. If they had a question, they would phrase their question and go on. Some were questions that were capable of being answered. Some were questions that were rhetorical. Some were questions that were of a negative parlance. There were a series of types of questions. But cross-examination as we would know it in this room was not part of the process.”

Mayor Ghilardi further testified that the village board voted to approve the Meijer development and that an extraordinary majority was needed for the various approvals because the plan commission and the zoning board each recommended denial.

Following the preliminary injunction hearing, the trial court issued a memorandum opinion and order granting the preliminary injunction. The trial court principally relied on 
E&E Hauling, Inc. v. County of Du Page
, 77 Ill. App. 3d 1017 (1979), holding that, although Mayor Ghilardi, as chair of the July 1998 hearing, had a right to impose reasonable conditions on the participation of the public, he could not totally deny plaintiffs the right to question the witnesses for Meijer. The trial court further concluded that plaintiffs were likely to succeed on the merits of their claim that the public hearing was rendered illusory by the total denial of the right to examine Meijer’s witnesses. The trial court also concluded that irreparable injury could be presumed because the village board acted in violation of state law. The trial court ordered that no further action be taken on the Meijer site until further order of the court or until the village held a proper public hearing on the matter. Defendants appealed.

The majority of the appellate panel affirmed. The appellate majority reasoned:

“[W]hen a local legislative body no longer crafts rules of general application but instead acts to grant permits, make special exceptions, or decide particular cases, it functions less like a legislative body and its actions are better described as administrative, quasi-judicial, or judicial in character. 
Bossman v. Village of Riverton
, 291 Ill. App. 3d 769, 772-73 (1997), citing 
Ward v. Village of Skokie
, 26 Ill. 2d 415, 424 (Klingbiel, J., specially concurring). Placing such functions in the hands of legislative bodies creates an obvious opportunity for the extension of special privileges to those well-connected politically and presents a challenge to the basic concepts of due process embodied in our legal system. See 
Ward
, 26 Ill. 2d at 424 (Klingbiel, J., specially concurring).” 316 Ill. App. 3d at 779.

Justice Rapp dissented, contending that municipal annexation and zoning are purely legislative functions. 316 Ill. App. 3d at 787 (Rapp, J., dissenting). Therefore, according to Justice Rapp, a municipal board need only allow interested parties to present their cases, rather than holding an adversarial proceeding with cross-examination. 316 Ill. App. 3d at 788 (Rapp, J., dissenting).

We granted defendants leave to appeal and further granted leave to a group of other municipalities to submit an 
amicus curiae
 brief in support of defendants.
(footnote: 2) See 155 Ill. 2d R. 345.

II. ANALYSIS

A. Standing

As a threshold matter, defendants allege that plaintiffs lack standing to bring the present action. According to defendants, plaintiffs failed to establish any special injuries different from those of the general public. In an unpublished portion of its opinion, the appellate court disagreed, holding that plaintiffs had established standing as a result of their proximity to the proposed development.

In support of this holding the court cited 
Yusuf v. Village of Villa Park
, 120 Ill. App. 3d 533 (1983). The court in 
Yusuf
 held that a diminution in value and a loss in the quiet enjoyment of one’s property caused by additional traffic and noise created by a proposed special use was adequate to confer standing on adjoining property owners. 
Yusuf
, 120 Ill. App. 3d at 538. The appellate majority in this case likewise held that any increase in noise, traffic or light pollution created by the development would affect the use and enjoyment of plaintiffs’ properties in a manner distinct in both quantity and quality from any injury suffered by the public as a whole. We agree with this conclusion.

Allegations identical to those raised by the plaintiffs in 
Yusuf
 were raised by plaintiffs in this case. Those allegations were supported by the testimony of plaintiffs as well as the testimony of Paul Davis, a real estate appraiser, at the preliminary injunction hearing. Thus, this showing was sufficient to confer plaintiffs with standing to pursue injunctive relief.

Concerning their 
quo warranto
 claims, however, the appellate majority found that plaintiffs had failed to establish standing. According to the appellate majority, plaintiffs’ contentions that a diminution in municipal services would result from the proposed development were speculative. Specifically, the majority held that plaintiffs did not prove that the additional tax revenue generated by the development would not offset the cost of providing additional municipal services. Plaintiffs have not appealed this holding. Accordingly, we will not address the issue.

B. Preliminary Injunction

The primary focus of our review is whether the circuit court properly granted injunctive relief to plaintiffs. A preliminary injunction is intended to preserve the status quo pending a decision on the merits of a case. 
Hartlein v. Illinois Power Co.
, 151 Ill. 2d 142, 156 (1992). A preliminary injunction is an extreme remedy that should be employed only in situations when an emergency exists and serious harm would result if the injunction is not issued. 
Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk & Western Ry. Co.
, 195 Ill. 2d 356, 365 (2001).

A party requesting a preliminary injunction must demonstrate: (1) a clearly ascertained right in need of protection; (2) irreparable harm in the absence of an injunction; (3) no adequate remedy at law for the injury; and (4) the likelihood of success on the merits. 
Hartlein
, 151 Ill. 2d at 156. On appeal, we examine only whether the party seeking the injunction has demonstrated a 
prima facie
 case that there is a fair question concerning the existence of the claimed rights. 
Callis
, 195 Ill. 2d at 366. The decision to grant or deny a preliminary injunction rests within the sound discretion of the trial court and on review the decision will not be disturbed absent an abuse of discretion. 
Desnick v. Department of Professional Regulation
, 171 Ill. 2d 510, 516 (1996).

1. 
Likelihood of Success on the Merits

The thrust of the parties’ arguments before this court centers on the fourth prong of injunctive relief: whether plaintiffs enjoy a likelihood of success on the merits. Success on the merits in this case would be a declaration by the trial court that any of the village ordinances annexing, rezoning, and granting a special use for the subject parcel are void due to the alleged procedural flaws of the joint public hearing. Defendants maintain that there is no likelihood of success on the merits because no right to cross-examination exists; plaintiffs and the courts below disagreed. Having distilled their arguments to focus mainly on this particular issue, we will similarly tailor our discussion.

a. Waiver

Before we engage in this discussion, we must, however, address defendants’ contention that plaintiffs waived any objection to the lack of cross-examination by failing to object to the joint hearing procedures. As we stated in 
Balmoral Racing Club, Inc. v. Illinois Racing Board
, 151 Ill. 2d 367, 397 (1992), formal objections go hand in hand with formal proceedings. It is disingenuous for defendants to maintain on the one hand that the municipal boards properly used informal proceedings at the joint hearing while, on the other hand, arguing that a formal objection was necessary to preserve plaintiffs’ claim of error.

More importantly, we agree with the appellate court that there is no need to object when it is apparent that an objection would be futile. See 
Bianchi v. Mikhail
, 266 Ill. App. 3d 767, 776 (1994). Mayor Ghilardi’s preliminary statements regarding the procedures to be employed at the hearing were unequivocal. He made clear that “there [would] be no attempt at [the] hearing to answer any question raised by the audience [members]” and that he would not consider any procedural objections raised by the public. In such a situation, we believe a formal objection is not required to preserve allegations of error. We therefore hold that plaintiffs did not waive any error resulting from the denial of their right to cross-examination.

b. Merits

Turning to the merits of the parties’ arguments, defendants maintain that the plain language of the applicable provisions of the Illinois Municipal Code (Municipal Code or Code) (65 ILCS 5/1–1–1 
et seq
. (West 1998)) grants only notice and an opportunity to be heard at a public hearing concerning a special use in municipalities with a population of less than 500,000. See 65 ILCS 5/11–13–7, 11–13–1.1 (West 1998). Defendants contend that the lower courts improperly grafted provisions of the Municipal Code that only apply to larger cities onto the provisions of the Code applicable to the village in this case. See 65 ILCS 5/11–13–7, 11–13–7a (West 1998).
(footnote: 3)
 Plaintiffs counter that the right to cross-examine witnesses is implied in the legislature’s requirement of a “public hearing” in zoning matters because a public hearing is meaningless if the audience is not allowed to participate. Plaintiffs further contend that decisions interpreting “public hearing” to include the right to cross-examine witnesses (see, 
e.g.
, 
E&E Hauling, Inc. v. County of Du Page
, 77 Ill. App. 3d 1017, 1021 (1979); 
Braden v. Much
, 403 Ill. 507, 513 (1949)) predate amendments to the applicable sections of the Code. According to plaintiffs, the legislature’s decision not to define further the term in light of controlling authority clearly shows that the legislature intended that public hearings include the right to cross-examine.

The appellate majority agreed with plaintiffs, determining that a right of cross-examination was implicit in the applicable Municipal Code sections. Recognizing that the court in 
E&E Hauling
 defined the term “public hearing” in relation to the Counties Code then in effect (Ill. Rev. Stat. 1977, ch. 34, par. 3158 (now codified, as amended, at 55 ILCS 5/5–12014 (West 1998))), the appellate majority also noted the 
E&E Hauling
 court’s statement that “ ‘[t]he general rule is well established that a “ ‘public hearing’ 
before any tribunal or body
” means “the right to appear and give evidence and also the right to hear and examine the witnesses whose testimony is presented by opposing parties.” ’ ” (Emphasis added.) 316 Ill. App. 3d at 780, quoting 
E&E Hauling
, 77 Ill. App. 3d at 1021, quoting 
Braden
, 403 Ill. at 513. Turning directly to the tribunals at issue in this case, the appellate majority specifically observed that zoning boards

“ ‘ “often deal[ ] with important property interests; and a denial of a right to cross-examine may easily lead to the acceptance of testimony at its face value when its lack of credibility or the necessity for accepting it only with qualifications can be shown by cross-examination.” ’ ” 316 Ill. App. 3d at 780, quoting 
E&E Hauling
, 77 Ill. App. 3d at 1022, quoting 
Wadell v. Board of Zoning Appeals
, 136 Conn. 1, 8, 68 A.2d 152, 155 (1949).

Therefore, the appellate majority concluded that the sections of the Municipal Code that specifically grant a right of cross-examination to those property owners within 250 feet of a special use in a municipality of more than 500,000 persons (see 65 ILCS 5/11–13–7, 11–13–7a (West 1998)) may be impliedly read into the remaining sections of the Code that cover the municipality at bar (see 65 ILCS 5/11–13–1.1 (West 1998)). 316 Ill. App. 3d at 781-82. According to the appellate majority, the legislature’s provision of more specific guidelines for the largest municipalities shows an intent to have more flexibility in the remaining municipalities. 316 Ill. App. 3d at 781. Moreover, the appellate majority observed that it would be absurd to grant the right of cross-examination to adjoining landowners in larger municipalities, while providing only an illusory right to landowners in smaller municipalities. 316 Ill. App. 3d at 781.

We are unwilling to adopt the appellate majority’s blanket endorsement of the 
E&E Hauling
 determination that a “ ‘ “ ‘public hearing’ 
before any tribunal or body
” ’ ” includes the full panoply of due process rights. (Emphasis added.) 316 Ill. App. 3d at 780, quoting 
E&E Hauling
, 77 Ill. App. 3d at 1021, quoting 
Braden v. Much
, 403 Ill. 507, 513 (1949). To construe so broadly the phrase “public hearing” may be inappropriate in some instances. Thus, the appellate majority too strictly relied on the Municipal Code for its resolution of this cause. The resolution of this cause instead depends upon the distinction between legislative hearings and administrative hearings before municipal bodies.

Illinois courts have long held that municipal bodies act in a legislative capacity when they conduct zoning hearings. For example, the oft-cited decision in 
La Salle National Bank of Chicago v. County of Cook
, 12 Ill. 2d 40 (1957), articulated:

“It is well established that it is primarily the province of the municipal body to determine the use and purpose to which property may be devoted, and it is neither the province nor the duty of the courts to interfere with the discretion with which such bodies are vested unless the legislative action of the municipality is shown to be arbitrary, capricious or unrelated to the public health, safety and morals.” 
La Salle National Bank
, 12 Ill. 2d at 46.

We recently raised the question of whether to classify special use permit hearings as legislative matters or administrative matters in the context of whether a municipality’s decision is subject to administrative review in 
City of Chicago Heights v. Living Word Outreach Full Gospel Church & Ministries, Inc.
, 196 Ill. 2d 1 (2001). In 
Living Word
, we recognized that “the clear weight of authority in the United States holds that a legislative body acts administratively when it rules on applications for special use permits.” 
Living Word
, 196 Ill. 2d at 14. We further noted:

“[T]here is considerable force to the view that the decision of a legislative body to grant or deny an application for a special use permit, whether made by a county or municipality, should be viewed as an administrative act. The decisions from this court which have held to the contrary have been criticized. [Citation.] Further, our appellate court has suggested that, in light of amendments made to the Illinois Municipal Code governing special uses, the General Assembly has indicated a desire to treat the application process for a special use permit as an administrative function, at least with respect to municipalities. [Citations.]” 
Living Word
, 196 Ill. 2d at 15-16.

Thus, in 
Living Word
, we implicitly posed the question of whether we would continue to hold that zoning hearings on special use applications are legislative matters. The resolution of 
Living Word
, however, did not depend upon an answer to that question because the municipality’s decision regarding the special use permit in 
Living Word
 could not be sustained whether viewed as an administrative decision or a legislative one. See 
Living Word
, 196 Ill. 2d at 16-26.

Having been freshly and squarely presented with the question by the cause at hand, we now answer it by holding that municipal bodies act in administrative or quasi-judicial capacities when those bodies conduct zoning hearings concerning a special use petition. As we stated in 
Living Word
, the “clear weight of authority” so holds. 
Living Word
, 196 Ill. 2d at 14. To the extent any prior decisions of this court hold the contrary to be true, we now expressly overrule those decisions.

The reasons for classifying zoning hearings that deal with special use applications as administrative or quasi-judicial are manifest. In these hearings, the property rights of the interested parties are at issue. The municipal body acts in a fact-finding capacity to decide disputed adjudicative facts based upon evidence adduced at the hearing and ultimately determines the relative rights of the interested parties. As a result, those parties must be afforded the due process rights normally granted to individuals whose property rights are at stake. See 
Balmoral Racing Club
, 151 Ill. 2d at 405 (the starting point, in any due process analysis, is a determination of whether one of these protectable interests–life, liberty or property–is present); 
Brown v. Air Pollution Control Board
, 37 Ill. 2d 450, 454 (1967) (“a proceeding *** which could affect one’s property rights *** [is] governed by the fundamental principles and requirements of due process of law”).

To what extent the full panoply of due process rights commonly associated with quasi-judicial proceedings must be afforded interested parties depends upon the purpose of the hearing. As stated by the United States Supreme Court in 
Hannah v. Larche
, 363 U.S. 420, 4 L. Ed. 2d 1307, 80 S. Ct. 1502 (1960),

“ ‘Due process’ is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. Thus, when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process. On the other hand, when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used. Therefore, as a generalization, it can be said that due process embodies the differing rules of fair play, which through the years, have become associated with differing types of proceedings. Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account.” 
Hannah
, 363 U.S. at 442, 4 L. Ed. 2d at 1321, 80 S. Ct. at 1514-15.

See also 
Abrahamson v. Illinois Department of Professional Regulation
, 153 Ill. 2d 76, 92 (1992) (due process is a flexible concept and requires only such procedural protections as fundamental principles of justice and the particular situation demand); accord 
Scott v. Department of Commerce & Community Affairs
, 84 Ill. 2d 42, 51 (1981); compare 
Petersen v. Plan Comm’n
, 302 Ill. App. 3d 461, 468 (1998) (all aspects of due process protection need not be afforded at a fact-gathering hearing conducted before a plan commission), with 
E&E Hauling
, 77 Ill. App. 3d at 1022 (failure to permit cross-examination at a zoning board hearing violates due process).

According to the testimony at the preliminary injunction hearing, the joint hearing in the cause at hand served several purposes. The village board was gathering facts to evaluate the proposed annexation. The plan commission was considering Meijer’s proposed development plan and determining whether to recommend that plan to the village board. The zoning board was, likewise, assessing the special use and rezoning requests with an eye toward whether to recommend that the village board grant the requests. Since the joint procedure used by the village involved a special use request, it would be a denial of due process not to afford interested parties the right to cross-examine adverse witnesses. See 
Living Word
, 196 Ill. 2d at 21-22; see also 
Balmoral Racing Club
, 151 Ill. 2d at 410-11 (cross examination is “ ‘the most efficacious test for the discovery of the truth’ ”). Plaintiffs have shown a reasonable likelihood that the court will conclude they were entitled to this right of cross-examination. We recognize that the right is not unlimited and may be tailored by the municipal body to the circumstances specifically before it. See 
Hyson v. Montgomery County Council
, 242 Md. 55, 67, 217 A.2d 578, 586 (1966) (the relevance of cross-examination varies with the nature of the evidence presented and requires a similar exercise of discretion by the body conducting the hearing).

The appellate majority offered some particularly instructive comments concerning limitations to the right of cross-examination that may be instituted by a municipal body in order to ease its administrative burdens:

“[A] municipality could adopt rules limiting the class of individual allowed to exercise a right of cross-examination. A municipality could, within reasonable limits, require those wishing to exercise the right of cross-examination to register in advance of the public hearing. Those wishing to exercise their right of cross-examination could also be required to allege some special interest beyond that of the general public. A municipality could ease the administrative burden of identifying those with a special interest by adopting a rule creating a presumption of the right to cross-examination in favor of an identified class. The legislature made a similar classification when it adopted the 250-foot notice requirement contained in section 11–13–7. [Citation.] The desires of neighboring property owners alone cannot justify a zoning restriction, but the preservation of property values is one purpose of zoning ordinances, and the diminution of property values in a neighborhood is one factor that should be considered before a change in zoning. [Citations.] A municipality should be free to adopt reasonable limitations on the right of cross-examination uniquely suited to local conditions, but the reasonableness of any limitation on the rights of adjoining property owners must be judged in light of the potential impact on property values in the neighborhood.

Similarly, a municipality may reasonably restrict the right of cross-examination based on subject matter. The presiding officer at a public hearing may identify those witnesses whose testimony will or will not be subject to cross-examination. The factors to be considered include, but are not limited to, the complexity of the issue, whether the witness possesses special expertise, whether the testimony reflects a matter of taste or personal opinion or concerns a disputed issue of fact, and the degree to which the witness’s testimony relates to the factors to be considered in approving the proposal. Such a determination may be made either immediately after the witness’s testimony or may be made in advance based on the anticipated testimony. Additionally, the hearing officer could adopt rules specifying which factual issues are considered relevant to the decision and limiting cross-examination to witnesses addressing those issues. Such a procedure would have the additional benefit of identifying for interested parties those factual issues considered relevant by the decision maker.” 316 Ill. App. 3d at 783-84.

While an interested party’s right of cross-examination may be tailored by guidelines such as these, that right may not be wholly contravened by the procedures used at the joint hearing at issue here.

As we have noted, the joint hearing in this case involved multiple decisions by three separate intra-municipal bodies. Viewed independently based on the individual purposes of each municipal body, whether and to what extent interested parties should be afforded the right to cross-examine adverse witnesses varies depending upon the type of hearing at issue. When a municipal body acts legislatively, its decision is subject only to review for arbitrariness as a matter of substantive due process. 
Living Word
, 196 Ill. 2d at 14. The joint hearing in this case, however, involved a quasi-judicial proceeding in that a special use application was heard and interested parties were not afforded the right to cross-examine adverse witnesses. In light of this deficiency, we agree with the trial court’s and appellate court’s ultimate conclusion that plaintiffs enjoy a likelihood of success on the merits of their claim that their constitutional right to due process was infringed. Therefore, the trial court properly issued a preliminary injunction in this case.

2. 
Remaining Issues

We are also asked by the parties to comment upon the procedures used by the village as a whole. The advantages of a joint hearing among several intra-municipal bodies addressing the same general issues are clear. Efficiency, convenience, and cost-effectiveness are plainly served by an omnibus procedure. For example, under that system there is no need for parties to produce the same evidence at multiple hearings. Moreover, interested members of the public may attend a single hearing and assure themselves that their concerns are expressed to each relevant municipal body.

We must admonish public bodies, however, that the disadvantages of a joint hearing are similarly apparent. As evidenced by this case, the size of the public audience provided little flexibility in conducting the hearing. While time limits may be necessary in certain circumstances, the two-minute time limit imposed here would have been clearly improper had the proceedings complied with the due process requisite of cross-examination for interested parties. In addition, the need for an appropriate officer to lead such an omnibus procedure is evident, but allowing the chief executive officer of the village to oversee a hearing of several of its boards is of questionable propriety at best.

Each of these concerns should be taken into account when municipalities craft procedures for joint hearings among those bodies involved in considering special use applications. The overarching objective should be to create a procedure that provides for and safeguards the due process rights of the interested parties but does not interfere with the independent evaluations by the individual municipal bodies.

III. CONCLUSION

For the reasons set forth above, we hold that plaintiffs have shown a reasonable likelihood of success on the merits. A landowner whose parcel adjoins a tract of land subject to a special use application cannot be entirely denied the right to cross-examine adverse witnesses at a public hearing regarding the special use application. The complete denial of such a right to interested landowners runs afoul of due process.

Accordingly, we affirm the appellate court’s affirmance of the circuit court’s preliminary injunction.

Affirmed.

JUSTICE RARICK took no part in the consideration or decision of this case.

FOOTNOTES
1:     
1
The underlying facts of the joint public hearing are fully set forth in the opinion of the appellate court. 316 Ill. App. 3d 770. We need only summarize those facts necessary to address this appeal.

2:     
2
The 
amicus curiae
 brief was submitted by the villages of Bannockburn, Grayslake, Hinsdale, Lake Bluff, Lake Zurich, and Northbrook and the cities of Highland Park and Lake Forest.

3:     
3
The relevant text of section 7a of the Municipal Code, distinguishing the enumerated rights of property owners in municipalities with a population of more than 500,000 from those of property owners in municipalities of less than 500,000, is as follows:

“Zoning variation and special use applicants and property owners, as set forth in Section 11–13–7 of this Act, shall have the following rights, in addition to any others they may possess in law, at any hearing before a board of appeals:

(a) to have subpoenas issued for persons to appear at board of appeals’ hearings and for examination of documents by the person requesting the subpoena either before or at board of appeals hearings subject to the limitations in this Section. ***

(b) 
To cross examine all witnesses testifying
.

(c) To present witnesses on their behalf.

Property owners within the terms of Section 11–13–7 who object to the zoning application or special use application may, upon request, be granted 1 continuance for the purpose of presenting evidence to rebut testimony given by the applicant. The date of such continued hearing shall be in the discretion of the board of appeals.

This amendatory act of 1973 is not a limit upon any municipality which is a home rule unit.” (Emphasis added.) 65 ILCS 5/11–13–7a (West 1998).